UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PERFORMING ARTS CENTER OF SUFFOLK
COUNTY (D/B/A THE GATEWAY), ANNMARIE
ALLAN, JEFF BELLANTE, SCOT ALLAN, and
MICHAEL BAKER,

   Plaintiffs,

   -against-

ACTOR'S EQUITY ASSOCIATION, EQUITY-
LEAGUE PENSION TRUST FUND, EQUITY-
LEAGUE HEALTH TRUST FUND, EQUITY
LEAGUE 401(k) PLAN; BOARD OF TRUSTEES OF
THE EQUITY LEAGUE PENSION TRUST FUND;
BOARD OF TRUSTEES OF THE EQUITY LEAGUE
HEALTH TRUST FUND; and the BOARD OF
TRUSTEES OF THE EQUITY LEAGUE 401(K)
PLAN,

   Defendants.

CASE NO.

Plaintiffs PERFORMING ARTS CENTER OF SUFFOLK COUNTY (D/B/A THE

GATEWAY) ("Gateway"), ANNMARIE ALLAN ("Annmarie"), JEFF BELLANTE

("Bellante"), SCOT ALLAN ("Scot"), and MICHAEL BAKER ("Baker") (the four individuals,

the "Individual Plaintiffs" and, all, "Plaintiffs"), by and through their attorneys, FordHarrison

LLP, hereby file this Complaint against ACTOR'S EQUITY ASSOCIATION, and EQUITY-

LEAGUE PENSION TRUST FUND ("Pension Fund"), EQUITY-LEAGUE HEALTH TRUST

FUND ("Welfare Fund"), EQUITY LEAGUE 401(k) PLAN ("401(k) Plan") (the Pension Fund,

Welfare Fund, and 401(k) Plan hereinafter collectively referred to as the "Funds"), the BOARD

OF TRUSTEES OF THE EQUITY LEAGUE PENSION TRUST FUND, the BOARD OF

TRUSTEES OF THE EQUITY LEAGUE HEALTH TRUST FUND, and the BOARD OF

TRUSTEES OF THE EQUITY LEAGUE 401(K) PLAN (the Boards of Trustees shall be referred

to collectively as "Boards of Trustees") (collectively the "Defendants") and assert against Defendants as follows:

## **NATURE OF THE ACTION**

1. Defendant Actor's Equity Association ("Actor's Equity"), a national labor union representing over 51,000 member actors and stage managers in theater, has engaged in a long running scheme whereby it has led employers and its very own members, like Gateway and the Individual Plaintiffs – through a pattern of misrepresentations and/or omissions of fact – to believe that all understudy and assistant stage manager positions are "Actors" under the collective bargaining agreement (hereinafter referred to as "Covered Employees" or "Actors"), including those who work in on-call or standby positions, thereby entitling them to make contributions to and receive benefits from the Pension Fund, Welfare Fund, and 401(k) Plan.

2. Despite the long-term conduct of the Funds, Board of Trustees of the Funds, and Actor's Equity in accepting contributions and salary deferrals and representing that the contributions and salary-deferrals were proper, the Boards of Trustees of the Funds decided to suddenly and in unprecedented fashion unjustly and unilaterally terminate the Individual Plaintiffs' benefits from the Funds, in whole or in part.

3. Not only did the Boards of Trustees of the Funds decide to terminate the Individual Plaintiffs' benefits from the Funds, but it has unlawfully refused to return both the contributions that Gateway made on behalf of its employees and the Individual Plaintiffs' salary deferrals which were deducted from their paychecks and submitted to the 401(k) Plan.

4. Even more, the Board of Trustees of the Welfare Fund has demanded that Plaintiffs' pay $212,014.00 in health care costs previously incurred by the Welfare Fund, on the basis that the Individual Plaintiffs' employment as understudies and/or assistant stage managers

did not meet the definition of "Covered Employment" under the terms of the terms of the Actor Equity's Association Agreement and Rules Governing Employment in Non-Resident Dramatic Stock negotiated between the Actor's Equity Association and the Council of Stock Theaters (hereinafter the "CBA").

5.      The determination reached by the Boards of Trustees of the Funds is either a result of both Actor Equity and the Funds' ongoing fraudulent and negligent scheme to fill their own coffers and favor their own interests over signatory employers and its very own members, or, alternatively, is the result of the respective Funds wrongful and illegitimate denial of benefits. Either way, Defendants have been unjustly enriched, having collected and retained thousands of dollars in contributions from both union members and their employers, only to pull the rug out from under them by, years later, denying the Individual Plaintiffs nearly, if not *all*, of their pension, welfare and 401(k) benefits, and then demanding a refund of amounts paid under the Welfare Fund.

6.      To remedy the severe harm caused by Defendants' actions, the Individual Plaintiffs bring this fraud, negligent misrepresentation, and breach of duty of fair representation action against Actor's Equity, and breach of fiduciary duty action against the Boards of Trustees of the Funds under Section 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (29 U.S.C. § 1132(a)(3)), ERISA Section 404(a) (29 U.S.C. § 1104(a)), and ERISA Section 105 (29 U.S.C. § 1025), and, alternatively, seek declaratory relief and/or to enforce their rights under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(b)) in connection with the Funds wrongful denial of their benefits. Similarly, Gateway brings this fraud action against Actor's Equity and the Funds, and, alternatively, seeks declaratory relief that the Individual Plaintiffs are covered employees and Gateway is not obligated to repay any costs. Finally,

Gateway seeks repayment of all employer contributions paid to the Funds to the extent the Individual Plaintiffs are determined not to be Covered Employees.

<div align="center">**JURISDICTION**</div>

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, specifically ERISA, 29 U.S.C. § 1132(e)(1), and § 301 of the Labor-Management Relations Act, as amended, 29 U.S.C. § 185, and 29 U.S.C. § 141.

8.      This Court has personal jurisdiction because ERISA provides for a nationwide service of process. 29 U.S.C. § 1132(e)(2). Defendants are residents of the United States and subject to service in the United States, and the Court therefore has personal jurisdiction over them. The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because Defendants would be subject to a court of general jurisdiction in this District as a result of Defendants being located in, transacting business in, and having significant contacts with this District.

9.      Declaratory relief is authorized by ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) by the Declaratory Judgment Act, 28 U.S.C. § 2201, *et al*.

10.     Plaintiffs request that the Court exercise supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.

<div align="center">**VENUE**</div>

11.     Venue in this Court is proper under ERISA § 502 (e)(2), 29 U.S.C. § 1132 (e)(2), in that Defendants may be found in this District and the underlying activity took place in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants systematically and continuously do business in this District and because a substantial part of the

events and omissions giving rise to the claims asserted herein occurred within this District.

<p style="text-align: center"><u>**PARTIES**</u></p>

12.     Gateway was and is a corporation authorized to transact business in New York State with offices located at 215 S. Country Road, Bellport, New York 11713.  At all relevant times, Gateway was the Individual Plaintiffs' employer and a party to a CBA with Actor's Equity.

13.     Annmarie was and still is a resident of New York State, Suffolk County.  At all times relevant to this action, Annmarie was or still is an employee of Gateway, a union member of Actor's Equity and a participant in the Funds as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Bellante was and still is a resident of New York State, Suffolk County.  At all times relevant to this action, Bellante was or still is an employee of Gateway, a union member of Actor's Equity, and a participant in the Funds as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).

15.     Baker was and still is a resident of New York State, Suffolk County.  At all times relevant to this action, Baker was or still is an employee of Gateway, a union member of Actor's Equity, and a participant in the Funds as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).

16.     Scot was and still is a resident of New York State, Suffolk County.  At all times relevant to this action, Scot was or still is an employee of Gateway, a union member of Actor's Equity, and a participant in the Funds as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).

17.     Upon information and belief, Actor's Equity was and is a labor organization with offices located at 165 West 46th Street, New York, NY 10036.  At all relevant times, Actor's Equity was and is a labor organization within the meaning of the Labor Relations Act and has been an employee organization within the meaning of ERISA § 3(4), 29 U.S.C. § 1002(4). Actor's Equity operates as the Individual Plaintiffs' labor union and is a party to the CBA.

18.     The Funds receive contributions from numerous employers pursuant to various

collective bargaining agreements between the employers and Actor's Equity, and therefore are multi-employer plans under 29 U.S.C. §§ 1002(37) and 1302(a)(3).

19.      Upon information and belief, the Funds are administered at 165 West 46th Street, New York, New York 10036.

20.      The Pension Fund and Welfare Fund are employee benefit funds that receive contributions from numerous employers pursuant to the CBA, and therefore are multi-employer plans under 29 U.S.C. §§ 1002(37) and 1302(a)(3).

21.      The 401(k) Plan is a defined contribution fund that receives contributions from numerous employers pursuant to the terms of the CBA which are derived from salary deferrals as directed by Covered Employees.

22.      The Board of Trustees of the Pension Fund, Welfare Fund, and 401(k) Plan are the named fiduciaries, Plan Administrators, and Plan Sponsors of the Pension Fund, Welfare Fund, and 401(k) Plan respectively within the meaning of  29 U.S.C. § 1002(16)(a)(i), 29 U.S.C. § 1002(21), 29 U.S.C. § 1301(a)(10)(A).

<div align="center">

**FACTS RELEVANT TO ALL CAUSES OF ACTION**
</div>

**Actor's Equity and its Membership Fees and Benefits**

23.      Founded in 1913, Actor's Equity was established as a nationwide labor union that now represents more than 51,000 members, including actors and stage managers.

24.      The CBA and Letters of Agreement that signatory employers enter into with Actor's Equity define the rights, obligations, and benefits of Actor's Equity, producers (like Gateway), and union members, such as actors, understudies and stage managers.

25.      Actor's Equity requires union members to pay a $1,700 initiation fee, $174 in annual dues, and 2.5% of their gross earnings while performing work.

26.     In exchange for the above-described union dues, Actor's Equity, as a labor union, is organized with the limited and singular purpose of promoting and protecting the interests of its members, and ensuring their economic security, goodwill, and livelihood. In doing so, it negotiates better membership privileges, higher wages (including minimum weekly salaries) and benefits, including the right to vote, attend meetings, Equity-only auditions, housing and per diem benefits, and pension, health and 401(k) benefits that are provided pursuant to the terms of the Plan Documents of the Funds and as administered by the Funds.

**Gateway's Participation In The Funds As Signatory To the CBA**

27.     In or about 1950, Gateway was established to provide live performance theatre productions to local patrons in the Long Island Area.  At the time, Gateway's employees, including actors, were not members of a union.

28.     As one of the oldest professional theatres in Long Island, Gateway is a small local non-profit theater company with limited resources that strives to enrich a wide range of communities with quality theatrical experiences through diverse arts, entertainment and educational programs.

29.     Eventually, Gateway began employing actors who were union members of Actor's Equity.

30.     Gateway is an employer engaged in an industry affecting commerce which executed Letters of Agreement on April 20, 2015 and July 24, 2018, whereby it agreed to be bound by the CBA. (A copy of the CBA is attached as **Exhibit 1**); (2015 Letter of Agreement is attached as **Exhibit 2**); (2018 Letter of Agreement is attached as **Exhibit 3**).

31.     Pursuant to the terms of the Letter Agreements, Gateway agreed to make weekly contributions to the Pension Fund and Welfare Fund on behalf of all Covered Employees at the

rate of 8.00% of all gross weekly salary *per week per Actor*. (Exhibit 2); (Exhibit 3).

32.     Pursuant to the terms of the 2015 Letter Agreement, Gateway agreed to make a weekly contribution to the Welfare Fund at the rate of $173.00 *per week per Actor*, and pursuant to the terms of the 2018 Letter Agreement, Gateway agreed to make a weekly contribution to the Welfare Fund at the rate of $177.00 *per week, per Actor* (Exhibit 2); (Exhibit 3).

33.     The Welfare Fund also provides health benefits to Actors who make $100 quarterly contributions and complete the requisite number weeks of covered employment each year as follows: to qualify for 6 months of coverage, Actors must have least 11 weeks of covered employment in any 12 calendar months.  To qualify for 12 months of coverage, Actors must have 19 weeks of covered employment in any 12 calendar months.

34.     Pursuant to the terms of the Letter Agreements, Gateway agreed to make salary deferrals as directed by its Covered Employees and remit the same to the 401(k) Plan.  (Exhibit 2); (Exhibit 3).

35.     Prior to engaging in any performance, Gateway and Covered Employees are required to execute "Equity Contracts" that detail the terms of employment, including rate of pay, production schedules, and position.

36.     Section 20(A) of the CBA and Section 7 of the Letter Agreements define the term "Actor" broadly to include persons who are signed to Equity Contracts, including principals stage managers, assistant stage managers, and understudies, professional theater interns, supplemental extras, and extras. (Exhibit 1-3).

37.     Section 20(A) further provides that "[i]t is expressly understood that Stage Managers, all Assistant Stage Managers, Swings, Dance Captains, and Understudies employed hereunder are entitled to benefits provided to Actors…" (Exhibit 1).

38. Actor's Equity receives, reviews and/or accepts Equity Contracts for all Actors who have been employed by Gateway, including the Individual Plaintiffs.

39. Actor's Equity's acceptance of an Equity Contract without any objection to and/or concern confirms, not just to Gateway (and other like employers), but more importantly, to its members, that the Actor's employment under the Equity Contract is covered by the CBA. If it was not covered employment, then Actor's Equity would, at a minimum, be abrogating its duty to its members to notify them of such. Otherwise, Actor's Equity allows its members to proceed with the belief that their employment is covered and that they can forgo obtaining health and retirement benefits through other sources.

**Actor's Equity and the Funds Misrepresentations and/or Omissions**

40. From at least in or about 1995 to the present, Actor's Equity has always represented to Plaintiffs that Gateway and other theatres are permitted to employ Actors as on-call or standby understudies or assistant stage managers, and that such employees would be afforded all rights, privileges, and benefits under the CBA.

41. The practice is widely accepted in the industry and encouraged by Actor's Equity because smaller playhouses, like Gateway, do not have the resources to hire different assistant stage managers and understudies for each and every production, but need several on-call or standby understudies and/or assistant stage managers to ensure sufficient coverage for productions during an entire season.

42. In or about 1995, Gateway hired Jerry Lapidus ("Lapidus") to work as a manager for Gateway. Prior to joining Gateway, Lapidus worked for Actor's Equity and was assigned by Actor's Equity as Gateway's business representative.

43. Gateway hired Lapidus because of his expertise and experience in administering

Equity Contracts and in handling union issues.

44.     Gateway hired Lapidus with the understanding that Lapidus would largely perform in an administrative role for Gateway.

45.     Nonetheless, after he was hired, Lapidus was assigned an Equity Contract as an on-call or standby assistant stage manager on various productions.

46.     The practice was common in the industry and widely accepted by Actor's Equity.

47.     Subsequent business representatives assigned by Actor's Equity confirmed Lapidus's Equity Contracts, even though they knew that Lapidus was engaged as a standby assistant stage manager.

48.     At no time did Actor's Equity, its business representatives, or any other employee or agent of Actor's Equity ever raise concerns regarding Lapidus's membership with Actor's Equity or his role as an on-call or standby assistant stage manager.

49.     Instead, Actor's Equity received and accepted union dues from Lapidus, and the Funds received and processed pension, health and 401(k) benefit contributions (salary deferral) from Gateway on behalf of Lapidus, without objection for at least six (6) years.  Certainly, neither Actor's Equity nor any representative of the Funds, including the Boards of the Trustees, once objected to or contested Lapidus's union membership or contributions.

50.     By accepting Lapidus' membership, his Equity Contracts, and his union dues and contributions, Actor's Equity and the Funds confirmed that Lapidus was a union member of Actor's Equity, engaged in covered work as a standby assistant stage manager, and deemed the contributions submitted on his behalf proper.

51.     Actor's Equity continued to accept Equity Contracts from Gateway for Actors who were engaged as on-call/standby assistant stage managers.

52.     In or about late 2013, Matthew Conti ("Conti"), who was employed by Actor's Equity and was Gateway's business representative at the time, advised Paul Allan ("Paul"), Gateway's Artistic Director, that having Actors as on-call/standby assistant stage managers to a production was covered under the CBA.  During the conversation, Conti never once stated that having assistant stage managers in an on-call/standby capacity was not covered by the CBA.

53.     In fact, in or about late December 2013, Conti and his assistant, Jennifer Camp ("Camp"), attended a live performance for *Beauty and the Beast*.  Although several on-call/standby Actors were not present at the production because they were not needed, neither Conti nor Camp voiced *any* objection or concern regarding their absence.

54.     In or about June 2014, Conti spoke with Paul about some of the Equity Contracts for assistant stage managers and understudies.  Conti confirmed that Gateway can hire understudies, even in an on-call/standby capacity, and that such employees would be guaranteed the rights, privileges, and benefits under the CBA, which clearly includes benefits from the Funds.

55.     Therefore, Actor's Equity endorsed and promoted the practice and actively encouraged Gateway to employ certain employees (who also performed non-covered administrative work), like the Individual Plaintiffs, as on-call/standby understudies or assistant stage managers.

56.     In reliance on Actor's Equity's representations and/or omissions, Gateway continued to employ the Individual Plaintiffs as understudies and/or assistant stage managers (both covered under the definition of Actor in the Letter Agreements and CBA) and make contributions to the Funds on their behalf, with the understanding that the positions were covered under the CBA such that the Individual Plaintiffs are eligible for and entitled to pension, health, and 401(k) benefits from the Funds.

57. Since 1995, Actor's Equity has continued to accept Equity Contracts for all understudy and assistant stage manager positions from the Individual Plaintiffs. Throughout all this time, Actor's Equity *never* informed Gateway or any of the Individual Plaintiffs that on-call/standby understudies or assistant stage manager positions were not covered by the CBA.

58. In addition, the plain terms of the Letter Agreements require weekly contributions to the Pension Fund and Welfare Fund on behalf of all Actors on a per week, per Actor basis without regard to whether the Actor performed work that week. (Exhibit 2); (Exhibit 3).

59. Upon information and belief, employers across the country who are parties to the CBA are similarly told or led to believe by Actor's Equity that Actors engaged as such understudies and/or assistant stage managers qualify as work covered by the CBA and are entitled to benefits from the Funds.

60. If such employment is not covered, then Actor's Equity has made material misrepresentations and/or omissions of fact by accepting the Individual Plaintiffs' contracts and communicating to both Gateway and the Individual Plaintiffs that the Individual Plaintiffs' time as on-call/standby understudies and/or assistant stage managers was covered by the CBA and, therefore, they were entitled to benefits from the Funds.

61. In addition, if such employment is not covered, then the Board of Trustees of the Funds have negligently and improperly accepted contributions on behalf of Gateway employees for over six (6) years as well as misrepresented their eligibility to participate in the Funds for over six (6) years.

62. Actor's Equity intentionally made the material misrepresentations and/or omissions in order to defraud or mislead Plaintiffs for the purpose of increasing union membership and receiving union dues and other benefits.

63. Plaintiffs reasonably relied on the misrepresentations and/or omissions to their detriment in that Plaintiffs made years of contributions and relied on the misrepresentations and/or omission in not seeking alternative pension, health, and 401(k) benefits through other means.

64. As a result of the misrepresentations and/or omissions, Plaintiffs lost years of contributions made to the Funds and are now facing a demand from the Welfare Fund for $212,014.00, which allegedly represents amounts paid by the Welfare Fund in health benefits for the Individual Plaintiffs from January 1, 2014 through December 20, 2019. In fact, Annmarie and Bellante have had their *entire* pensions stripped from them, while Scot and Baker have had a portion of their retirement taken from them. Annmarie and Bellante have also had their 401(k), which are salary deferrals, stolen from them, in whole or in part.

65. Furthermore, to the extent the contributions that the Funds accepted for over six (6) years were not proper contributions, the Funds have absconded with thousands of dollars in Pension Fund and Welfare Fund contributions they were never entitled to.

66. While the Funds allege the contributions they have received from Gateway (including the salary deferral individual 401(k) contributions submitted by Gateway on behalf of the Individual Plaintiffs) over the last six (6) years were improper, the Funds have declined to return the money it, by its own allegation, shouldn't have received in the first place.

**Equity Funds' Illegal Denial of Benefits**

67. Despite accepting years of contributions, amounting to thousands of dollars, from both Gateway and the Individual Plaintiffs, the Funds have arbitrarily denied the Individual Plaintiffs' health, pension, and 401(k) benefits and demanded that Plaintiffs refund the amounts paid by the Welfare Fund for medical claims.

68. On or about November 28, 2018, the Funds notified Annmarie that it would

terminate her pension, health, and 401(k) benefits for periods prior to and including 2017 and 2018. In doing so, the Funds wrongfully kept years of contributions made by both Gateway and Annmarie (salary deferral) to each benefit plan without remitting the expected benefits to Annmarie.

69.     On or about March 6, 2019, the Funds notified Gateway and the Individual Plaintiffs that the Funds would no longer accept pension, health, or 401(k) contributions from Scot, Baker, and Bellante. The Funds also terminated Scot and Baker's Welfare Fund coverage and removed Pension Fund credits for all the Individual Plaintiffs that were made prior to and from January 1, 2017 through July 28, 2018. In doing so, the Funds wrongfully kept years of contributions made by both Gateway and Scot, Baker, and Bellante (salary deferral).

70.     The Individual Plaintiffs timely appealed the Funds' determinations described above by submitting their appeals on or before May 3, 2019.

71.     The Boards of Trustees of the Funds rejected the appeals, with few exceptions where the Funds acknowledged that it had incorrectly marked certain weeks of employment as not covered under the CBA.

72.     On or about December 20, 2019, the Boards of Trustees of the Funds issued their final determination regarding Gateway and the Individual Plaintiffs. In their letter, the Funds rejected most of the Individual Plaintiffs' appeals against its findings and determined that the Individual Plaintiffs were not entitled to certain pension, health, and 401(k) benefits (both those accrued in the past and future benefits) and demanded the repayment of over $200,000 in medical costs paid because they allege the Individual Plaintiffs were not Covered Employees.

73.     The Funds based their decision, in large part, by claiming that when the Individual Plaintiffs were employed as understudies and/or assistant stage managers, they were not engaged

in covered employment under the CBA.

74.     Plaintiffs are in this position as a result of Actor Equity and the Boards of Trustees of the Funds misrepresentations and/or omissions which Plaintiffs relied upon to their detriment, or, ***alternatively***, as a result of the Funds arbitrary and capricious denial of  the Individual Plaintiffs' benefits.

75.     The terms of the Letter Agreements are absolutely and unequivocally clear, namely, they require Gateway to submit weekly contributions to the Pension Fund and Welfare Fund per week, per Actor.   They further state that "the Actor shall have the option to contribute to the Equity-League 401(k) Plan."  Noticeably absent is any mention of how much work an Actor had to perform that week relating to Gateway's obligation to contribute to the Funds.  (Exhibit 2); (Exhibit 3).

76.     The Boards of Trustees of the Funds made its determination, despite the fact that throughout their employment, Gateway regularly submitted contributions on behalf of the Individual Plaintiffs.

77.     Throughout their employment, the Individual Plaintiffs met or exceeded the required minimum number of weeks to qualify for 12 months of coverage from the Welfare Fund.

78.     Throughout their employment, some or all of the Individual Plaintiffs elected to make 401(k) contributions, which were deducted from their salary from Gateway and contributed by Gateway to the 401(k) Plan.

79.     For all weeks for which the Individual Plaintiffs are entitled to benefits from the Funds, the Individual Plaintiffs executed Equity Contracts with Actor's Equity that confirmed that they were engaged in covered work as defined by the terms of the CBA.

80.     Under their Equity Contracts (which were received and validated by Actor's

Equity), the Individual Plaintiffs' generally were given the option to contribute to the 401(k) Plan.

81.     The Boards of Trustees of the Funds' determination is illogical and does not comport with the language of the CBA or the Letter Agreements, which provide that an "Actor" engaged in covered employment is an individual who works pursuant to an Equity Contract, and includes understudies and assistant stage managers.

82.     Therefore, the Individual Plaintiffs are entitled to their promised benefits from the Funds pursuant to the terms of the CBA, Letter Agreements, and Equity Contracts.

83.     In the alternative, if the Individual Plaintiffs were not Covered Employees, then the Funds have wrongfully absconded with thousands of dollars belonging to Gateway made in contributions pursuant to the terms of the Letter Agreements, and individual wages deducted from the Individual Plaintiffs' 401(k) accounts and contributed to the 401(k) Plan.

**The Harm Caused by Defendants**

84.     Actor's Equity and the Funds misconduct or, alternatively, the Funds' determination is without question an injustice that has effectively resulted in theft of Gateways' contributions and the Individual Plaintiffs' 401(k) contributions and benefits, and an illegal denial of benefits earned over years of hard work.

85.     Both Actor's Equity and the Boards of Trustees of the Funds misconduct or, alternatively, the Funds' determination has had a severe effect on the livelihoods of the Individual Plaintiffs.

86.     Baker has had extensive back and neck surgeries that was covered by the health insurance that he obtained through his status as an Actor's Equity union member.

87.     If Actor's Equity and the Funds' misconduct was allowed to stand or, alternatively, the Funds were permitted to illegally withhold contributions and seek recovery of amounts made

towards claims, then Baker would have no option but to pay tens of thousands of dollars that he does not have for his medical procedures.

88.     That defeats the entire purpose of health insurance, which includes providing financial security for members so that, in the event a serious medical situation arises, they are not crippled by healthcare costs.

89.     Had the Individual Plaintiffs not qualified for any benefits under the Funds, they would have obtained health and retirement benefits elsewhere.

90.     Accordingly, Actor's Equity and the Boards of Trustees of the Funds misconduct has resulted in loss of benefits and waste of years of Plaintiffs' contributions, or, alternatively, the Funds has violated the terms of the Funds' Plan Documents, the CBA, and the Letter Agreements by revoking the Individual Plaintiffs' pension, health and 401(k) benefits, retaining years of contributions made without refund, and demanding that the Individual Plaintiffs' pay the Welfare Fund for amounts disbursed pursuant to medical claims made for some or all of the Individual Plaintiffs.

**CAUSES OF ACTION**

**AS AND FOR THE FIRST CAUSE OF ACTION**
**THE INDIVIDUAL PLAINTIFFS' WRONGFUL DENIAL OF BENEFITS CLAIM**
**UNDER ERISA § 502(a)(1)(B) AGAINST THE BOARDS OF TRUSTEES OF THE**
**FUNDS AND THE FUNDS**

91.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90.

92.     The Funds receive contributions from numerous employers pursuant to various collective bargaining agreements between the employers and Actor's Equity, and therefore are multi-employer plans under 29 U.S.C. §§ 1002(37) and 1302(a)(3).

93.     The Funds are each an "employee benefit plan" within the meaning of ERISA §

3(3), 29 U.S.C. § 1002(3).

94.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant to bring a civil action to recover benefits due under the terms of the plan, to enforce his rights under the terms of the plan, and to clarify his rights to future benefits under the plan.

95.     The Individual Plaintiffs are participants in the Funds and have a colorable claim to benefits from the Funds.

96.     The Individual Plaintiffs were Actors as defined by the Letter Agreements and CBA and engaged in covered employment as evidenced by the Equity Contracts.

97.     By the terms of the Letter Agreements, CBA, and Funds' Plan Documents, the Individual Plaintiffs' are entitled to already accrued benefits as well as future benefits from (1) the Pension Fund and Welfare Fund based on contributions made by Gateway pursuant to the Letter Agreements on behalf of the Individual Plaintiffs, and (2) from the 401(k) Plan based on the Individual Plaintiffs' salary that Gateway deferred and contributed to the 401(k) Plan based on elections made by the Individual Plaintiffs.

98.     The Funds unlawfully revoked the Individual Plaintiffs' benefits, retained years of contributions made by the Individual Plaintiffs' without conferring the benefits required under the Plan because the Individual Plaintiffs are Covered Employees entitled to benefits from the Funds.

99.     In addition, the Welfare Fund made a demand to all Plaintiffs for refunds of amounts paid pursuant to past claims it allegedly paid on their behalf, which was wrongfully and unjustly made considering the Individual Plaintiffs are Covered Employees.

100.     The Equity Fund's actions have wrongfully denied benefits to the Individual Plaintiffs in violation of the Letter Agreements, CBA, Equity Contracts, the Funds' Plan

Documents, and ERISA.

101. Therefore, the Individual Plaintiffs are entitled, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132 (A)(1)(B), to recover such benefits due to them under the Plan, to enforce their rights under the terms of the Plan, and to clarify their rights to future benefits from the Plan.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**THE INDIVIDUAL PLAINTIFFS' CLAIM FOR VIOLATION OF ERISA**
**SECTION 404(a), 29 U.S.C. § 1104(a) AGAINST THE BOARDS OF**
**TRUSTEES OF THE FUNDS**

102. Plaintiff repeat and reallege each and every allegation contained in paragraphs 1 through 101.

103. Pursuant to ERISA Section 404(a), 29 U.S.C. § 1104(a), a fiduciary must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to the participants and their beneficiaries and defraying reasonable expenses of administering the plan, and that a fiduciary must act in compliance with the prudent person standard of care. The duties of a fiduciary include the duty to provide complete and accurate information regarding participants' and beneficiaries' benefits.

104. The Individual Plaintiffs are or were at one point participants in the Funds and have a colorable claim to benefits.

105. In the event that the Individual Plaintiffs are not Covered Employees and were not entitled to benefits from the Funds for some or all of the time period of January 1, 2014 through present, then the Boards of Trustees of the Funds breached their fiduciary duties under Section 404(a) of ERISA by acts and omissions including failing to ensure that they or their delegees provided the Individual Plaintiffs with complete and accurate information regarding their benefits from the Funds.

106. The Boards of Trustees of the Funds misrepresented to the Individual Plaintiffs that they were entitled to benefits from the Welfare Fund, the Pension Fund, and the 401(k) Plan by providing coverage for medical claims, providing explanations of benefits, accepting pension applications, distributing written pension statements, accepting 401(k) applications, and providing them with 401(k) statements.

107. The Individual Plaintiffs have reasonably relied on the information they received from the Funds in seeking medical care and making retirement planning decisions to their detriment by relying on inaccurate information about their health, pension, and 401(k) benefits, and have been harmed by the fiduciary breaches of the Boards of Trustees of the Funds.

<div style="text-align: center; font-weight: bold; text-decoration: underline;">

AS AND FOR THE THIRD CAUSE OF ACTION
THE INDIVIDUAL PLAINTIFFS' CLAIM FOR VIOLATION OF ERISA
SECTION 105, 29 U.S.C. § 1025 AGAINST THE BOARDS OF TRUSTEES OF
THE 401(k) PLAN

</div>

108. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 107.

109. ERISA Section § 105(a)(1)(i) (29 U.S.C. § 1025(a)(1)(i)) requires that the plan administrator of a defined contribution plan shall furnish a benefit statement (i) at least once each calendar quarter to a participant or beneficiary who has the right to direct the investment of assets in his or her account under the plan.

110. ERISA Section 502(a)(3) (29 U.S.C. § 1132(a)(3)) authorizes a plan participant to file suit to obtain injunctive and other appropriate equitable relief from a violation of ERISA.

111. ERISA Section 502(a)(1)(A) (29 U.S.C. §1132(a)(1)(A)) authorizes a plan participant to bring a civil action for the relief provided for in ERISA Section 502(c) (29 U.S.C. § 1132(c)).

112.     ERISA Section 502(c)(1)(A) (29 U.S.C. § 1132(c)(1)(A)) provides that any administrator who fails to meet the requirements of ERISA Section 105(a) (29 U.S.C. § 1025(a)) with respect to a participant may in the court's discretion be personally liable to such participant in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems just and proper. For this purpose, each violation with respect to any single participant shall be treated as a separate violation. 29 C.F.R. 2575.502c-1 increases the penalty under ERISA Section 502(c) up to $110 a day.

113.     The Individual Plaintiffs were and/or are participants in the 401(k) Plan and have a colorable claim to benefits.

114.     Some or all of the Individual Plaintiffs were distributed 401(k) statements which informed them that they had proper accounts in the 401(k) Plan which were invested in various mutual funds or similar investments.

115.     In the event that any Individual Plaintiffs were not entitled to some or all of the 401(k) contributions they made to the 401(k) Plan and the earnings thereon, then the Board of Trustees of the 401(k) Plan violated Section 105(a)(1)(A)(i) by failing to provide those Individual Plaintiffs with accurate statements of their 401(k) benefits.

116.     In the event that any Individual Plaintiffs were not entitled to some or all of the 401(k) contributions they made to the 401(k) Plan and the earnings thereon, those Individual Plaintiffs have been harmed by the Board of Trustees of the 401(k) Plan's breaches in that they received inaccurate information about what the amount of their retirement benefits were.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
**THE INDIVIDUAL PLAINTIFFS' CLAIM FOR VIOLATION OF ERISA**
**SECTION 105, 29 U.S.C. § 1025 AGAINST THE BOARDS OF TRUSTEES OF**
**THE PENSION FUND**

117. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 116.

118. ERISA Section 105(a)(1)(B) (29 U.S.C. § 1025(a)(1)(B)) requires that plan administrator, such as the Board of Trustees of the Pension Fund, furnish pension benefit statements to defined benefit plan participants. Specifically, a plan administrator must furnish a pension benefit statement (1) at least once every three (3) years to each participant with a nonforfeitable accrued benefit and who is employed by the employer maintaining the plan at the time the statement is to be furnished and (2) to a participant or beneficiary of the plan upon written request.

119. ERISA Section 502(a)(3) (29 U.S.C. § 1132(a)(3)) authorizes a plan participant to file suit to obtain injunctive and other appropriate equitable relief from a violation of ERISA.

120. ERISA Section 502(a)(1)(A) (29 U.S.C. §1132(a)(1)(A)) authorizes a plan participant to bring a civil action for the relief provided for in ERISA Section 502(c) (29 U.S.C. § 1132(c)).

121. ERISA Section 502(c)(1)(A) (29 U.S.C. § 1132(c)(1)(A)) provides that any administrator who fails to meet the requirements of ERISA Section 105(a) (29 U.S.C. § 1025(a)) with respect to a participant may in the court's discretion be personally liable to such participant in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems just and proper. For this purpose, each violation with respect to any single participant shall be treated as a separate violation. 29 C.F.R. 2575.502c-1 increases

the penalty under ERISA Section 502(c) up to $110 a day.

122.     The Individual Plaintiffs were and/or are participants in the Pension Fund and have a colorable claim to benefits.

123.     Some or all of the Individual Plaintiffs were distributed pension statements which informed them that they had proper accounts in the Pension Fund which were invested in various mutual funds or similar investments.

124.     In the event that any Individual Plaintiffs were not entitled to some or all of the pension contributions Gateway made on their behalf to the Pension Fund and the earnings thereon, then the Board of Trustees of the Pension Fund violated Section 105(a)(1)(B) by failing to provide those Individual Plaintiffs with accurate statements of their pension benefits.

125.     In the event that any Individual Plaintiffs were not entitled to some or all of the pension contributions Gateway made on their behalf to the Pension Fund and the earnings thereon, those Individual Plaintiffs have been harmed by the Board of Trustees of the Pension Fund's breaches in that they received inaccurate information about what the amount of their retirement benefits were.

<div align="center">

**AS AND FOR THE FIFTH CAUSE OF ACTION,
THE INDIVIDUAL PLAINTIFFS' CLAIM FOR VIOLATION OF ERISA
OTHER APPROPRIATE RELIEF UNDER ERISA § 502(a)(3) AGAINST THE
BOARDS OF TRUSTEES OF THE PENSION FUND, WELFARE FUND, AND
401(K) PLAN**

</div>

126.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 125.

127.     By reasons of the facts described above, including without limitation the Funds' demand for refund of amounts owed, a substantial and continuing controversy exists as to the rights of the Individual Plaintiffs.

128.     The Boards of Trustees of the Funds have a fiduciary duty to their participants and beneficiaries, including to the Individual Plaintiffs, which they have breached by misrepresenting the Individual Plaintiffs eligibility for and enrollment in the Funds, including by accepting contributions made by or on behalf of the Individual Plaintiffs and the coverage of prior health claims.

129.     The Individual Plaintiffs reasonably relied on the Boards of Trustees of the Funds' actions regarding their status as Plan participants.

130.     Such reliance was to the Individual Plaintiffs' detriment in that Gateway contributed to the Funds on behalf of the Individual Plaintiffs and the Individual Plaintiffs received benefits from the Funds for over six (6) years, including from the Welfare Fund for which the Welfare Fund now demands repayment.

131.     ERISA § 502(a)(3) authorizes a participant or beneficiary to bring a civil action to "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

132.     Pursuant to this ERISA provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65, Individual Plaintiffs seek: (a) an order declaring that the Individual Plaintiffs are  participants in the Plan; (b) requiring the Boards of Trustees of the Funds to retroactively reenroll the Individual Plaintiffs in each of the Funds; (c) estop the Boards of Trustees of the Funds from denying the Individual Plaintiffs their full benefits from the Funds; (d) surcharge the Boards of Trustees of the Funds in the amount necessary to place the Individual Plaintiffs in the position they would have occupied but for the Defendants' breaches; (e) order that the Boards of Trustees reform each of the Funds' Plan Documents to comply with the

representations made by the Funds regarding the Individual Plaintiffs' eligibility for and enrollment in the Funds; (e) estop the Boards of Trustees of the Funds and the Funds themselves, including but not limited to the Welfare Fund, from collecting from Gateway and/or the Individual Plaintiffs the amounts paid pursuant to claims paid by the Welfare Fund on behalf of the Individual Plaintiffs' and (f) other appropriate declaratory, injunctive, and equitable relief.

<div align="center">

**AS AND FOR THE SIXTH CAUSE OF ACTION**
**THE INDIVIDUAL PLAINTIFFS' FRAUD CLAIM AGAINST ACTORS' EQUITY**

</div>

133.    Plaintiffs repeat and reallege each and every allegation contained paragraphs 1 through 132.

134.    Actors' Equity, it agents, servants and/or employees knowingly and intentionally made false and inaccurate statements and concealed facts from Plaintiffs that were necessary for Gateway and the Individual Plaintiffs to evaluate Plaintiffs' coverage under the CBA and Letter Agreements, membership in Actor's Equity, and eligibility for pension, health, and 401(k) benefits.

135.    These false and inaccurate material misrepresentations and/or omissions of fact were made for the benefit of Defendants, in order to induce the Individual Plaintiffs to become union members and pay annual fees, union dues, and salary contributions.

136.    Actor's Equity's misrepresentations and/or omissions were reasonably relied upon by the Individual Plaintiffs to make material decisions affecting their union membership, health, and pension and 401(k) benefits.

137.    Because of Actor's Equity's knowingly false material misrepresentations and/or omissions, the Individual Plaintiffs lost years of pension, health and 401(k) contributions, as well as amounts paid towards claims made under the Individual Plaintiffs' health coverage.

138.    As a result of the foregoing, the Individual Plaintiffs have suffered, and are

continuing to suffer serious damages and irreparable injuries, including but not limited to, the loss of benefits, including but not limited to pension and health benefits, and attorneys' fees.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
## THE INDIVIDUAL PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM
## AGAINST ACTOR'S EQUITY

139.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 138.

140.    Actors' Equity, it agents, servants and/or employees negligently and/or knowingly made false and inaccurate statements and concealed material facts from Plaintiffs that were necessary for Gateway and the Individual Plaintiffs to evaluate Plaintiffs' coverage under the CBA, membership in Actor's Equity, and eligibility for pension, health, and 401(k) benefits.

141.    Actor's Equity, in its role as the Individual Plaintiffs' union, was under the duty and obligation to not knowingly make false and inaccurate statements to the Individual Plaintiffs.

142.    Therefore, Actor's Equity was aware and understood that its misrepresentations would be relied upon by the Individual Plaintiffs to make decisions regarding their pension, health and 401(k) benefits.

143.    In fact, Actor's Equity's misrepresentations and concealments were reasonably relied upon by the Individual Plaintiffs to make material decisions affecting their union membership, pension, health, and 401(k) benefits.

144.    Because of Actor's Equity's negligent misrepresentations, the Individual Plaintiffs lost years of pension, health and 401(k) contributions, as well as amounts paid towards claims made under their health coverage.

145.    As a result of the foregoing, the Individual Plaintiffs have suffered, and are

continuing to suffer serious damages and irreparable injuries, including but not limited to, the loss

of benefits, including but not limited to pension and health benefits, and attorneys' fees.

<div align="center">

**AS AND FOR THE EIGHTH CAUSE OF ACTION**
**THE INDIVIDUAL PLAINTIFFS' BREACH OF DUTY OF FAIR**
**REPRESENTATION CLAIM AGAINST ACTOR'S EQUITY**

</div>

146.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 145.

147.     Actor's Equity, its agents, servants and/or employees had a duty to exercise

reasonable care and competence in communicating benefit information to the Individual Plaintiffs

for which Actor's Equity knew or should have known the Individual Plaintiffs' would

detrimentally rely.

148.     Actor' Equity, its agents, servants and/or employees, negligently and carelessly

led the Individual Plaintiffs to believe that their roles as on call or standby understudies or

assistant stage managers were covered by the CBA and Letter Agreements such that they could

make contributions and be entitled to pension, health and 401(k) benefits from the Funds.

149.     Actor's Equity had a financial interest in supplying the false information or in

concealing the accurate information, including increasing its membership and recovering annual

fees, dues and salary contributions.

150.     Actor's Equity's acts therefore violate § 301 of the National Labor Relations Act,

in that its conduct was arbitrary, discriminatory and/or in bad faith.

151.     On December 20, 2019, the Funds informed the Individual Plaintiffs' of its final

decision to revoke years of the Individual Plaintiffs' pension, health and 401(k) contributions, as

well as amounts paid towards claims for their health coverage.  The Boards of Trustees of the

Funds' decision was the result of Actor's Equity's arbitrary, discriminatory and/or in bad faith

conduct.

152. Therefore, on December 20, 2019, the Individual Plaintiffs' knew that Actor's Equity breached its duty of fair representation.

153. As a result of the foregoing, Plaintiffs have suffered, and are continuing to suffer serious damages and irreparable injuries, including but not limited to, the loss of benefits, including but not limited to pension and health benefits, and attorneys' fees.

## AS AND FOR THE NINTH CAUSE OF ACTION
## GATEWAY'S FRAUD CLAIM AGAINST ACTORS' EQUITY, BOARDS OF TRUSTEES OF THE FUNDS AND THE FUNDS AND DEMAND FOR REFUND OF CONTRIBUTIONS

154. Plaintiffs repeat and reallege each and every allegation contained paragraphs 1 through 153.

155. Actors' Equity, it agents, servants and/or employees knowingly and intentionally made false and inaccurate statements and concealed facts from Plaintiffs that were necessary for Gateway and the Individual Plaintiffs to evaluate Plaintiffs' coverage under the CBA and Letter Agreements, membership in Actor's Equity, and eligibility for pension, health, and 401(k) benefits.

156. These false and inaccurate material misrepresentations and/or omissions of fact were made for the benefit of Defendants, in order to induce Gateway into employing Actor's Equity union members and to make contributions to the Funds as required under the CBA and Letter Agreements.

157. As a result of these misrepresentations, for over six (6) years, Gateway made contributions on behalf of the Individual Plaintiffs to the Pension Fund and Welfare Fund.

158. The Boards of Trustees of the Funds and the Funds themselves improperly accepted and applied these contributions and never once notified Gateway that the contributions

were improper.

159. The misrepresentations and omissions of Actors Equity, the Boards of Trustees of the Funds and the Funds themselves were reasonably relied upon by the Gateway to make material decisions affecting its employees' union membership and contribution obligations.

160. Because of these knowing false material misrepresentations and/or omissions by Defendants, Gateway lost years of contributions made to the Funds pursuant to the CBA and Letter Agreements, and its employees lost years of pension, health and 401(k) contributions, which the Defendants have refused to return.

161. As a result of the foregoing, Gateway has suffered, and are continuing to suffer serious damages and irreparable injuries, including but not limited to the loss of contributions submitted to the, Funds, and attorneys' fees.

162. To the extent that the contributions were not proper and should not have been accepted by the Funds, Gateway seeks an order requiring the Defendants to repay all of the monies that were contributed to the Pension Fund and Welfare Fund for which the Funds were not entitled to.

## AS AND FOR THE TENTH CAUSE OF ACTION
## GATEWAY'S CLAIM FOR DECLARATORY JUDGMENT AGAINST
## THE FUNDS

163. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 162.

164. By reasons of the facts described above, including without limitation the Welfare Fund's demand for refund of amounts owed, there is a genuine and bona fide substantial and continuing dispute and actual controversy between Gateway and the Boards of Trustees of the Funds and the Funds themselves.

165. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, Gateway seeks a declaration (a) reversing the Funds' denial of pension, health and 401(k) benefits from the Individual Plaintiffs, and (b) that the Funds, including but not limited to the Welfare Fund, cannot demand refund from Gateway of amounts paid by the Welfare Fund for claims made by the Individual Plaintiffs, including the $212,014.00 the Welfare Fund is demanding, or any other amounts paid.

## AS AND FOR THE ELEVENTH CAUSE OF ACTION
## PLAINTIFFS' UNJUST ENRICHMENT CLAIM AGAINST DEFENDANTS

166. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 167.

167. Defendants have been unjustly enriched by obtaining a benefit in the form of contributions and union dues from the Plaintiffs without providing any value for conferring that benefit.

168. Defendants should not be permitted to retain the contributions and union dues and premiums they took from the Plaintiffs under principles of equity and good conscience.

169. Therefore, this Court should order that Defendants refund all monetary union dues and contributions made by the Plaintiffs to the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court exercise jurisdiction over their claims and award:

(1) a declaration that the Individual Plaintiffs are participants in the Funds;

(2) an order requiring that the Boards of Trustees of the Funds retroactively reenroll the Individual Plaintiffs;

(3) an order estopping the Boards of Trustees of the Funds from denying the Individual Plaintiffs their full benefits from the Funds;

(4) an order reforming the Funds' Plan Documents to comply with the representations made by the Funds regarding the Individual Plaintiffs' eligibility for and enrollment in the Funds;

(5) an order estopping the Funds, including but not limited to the Welfare Fund, from collecting from Gateway and/or the Individual Plaintiffs the amounts paid by the Welfare Fund for claims made by the Individual Plaintiffs;

(6) a declaration that Gateway and the Individual Plaintiffs do not owe the Welfare Fund a refund for amounts it paid for the Individual Plaintiffs' claims;

(7) all compensatory, economic, and pecuniary damages, including lost benefits, contributions, and health care costs;

(8) attorneys' fees, interest and costs; and

(9) other appropriate declaratory, injunctive, and equitable relief.

Dated: June 5, 2020

**FORDHARRISON, LLP**

By:     /s/ Bran Noonan
     Bran Noonan, Esq.
     Mathew Grabell, Esq.
     Mohammad Shihabi, Esq.
     60 East 42nd Street, 51st Floor
     New York, New York 10165
     212-453-5900